WOLFF & SAMSON PC
THE OFFICES AT CRYSTAL LAKE
ONE BOLAND DRIVE
WEST ORANGE, NEW JERSEY 07052
973-325-1500
Attorneys for P.F.I., Inc./Northwest Petroleum

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

|   |   |   |
|---|---|---|
|  | : | Chapter 11 |
| In Re: | : |  |
|  | : | Case Nos. 09-30759 and 09-30760 |
| CECERE ASSOCIATES, L.L.C., and | : |  |
| CECERE REALTY ASSOC., LLC, | : | Hon. Donald H. Steckroth, U.S.B.J. |
|  | : |  |
| Debtors. | : | (JOINT ADMINISTRATION MOTION PENDING) |

**P.F.I., INC.'S OBJECTION TO DEBTORS' MOTION PURSUANT TO SECTIONS
105(a) AND 363 OF THE BANKRUPCY CODE AND BANKRUPTCY RULES 2002
AND 6004 FOR AN ORDER (I) ESTABLISHING AND APPROVING BIDDING
PROCEDURES WITH RESPECT TO THE SALE OF REAL PROPERTY OF THE
DEBTORS AND (II) APPROVING A SALE FREE AND CLEAR OF LIENS, CLAIMS,
<u>ENCUMBRANCES AND INTERESTS</u>**

**TO:   THE HONORABLE DONALD H. STECKROTH
United States Bankruptcy Judge
United States Bankruptcy Court for the District of New Jersey**

P.F.I., Inc./Northwest Petroleum ("PFI"), by and through its undersigned counsel, by way of objection to the motion by Debtors Cecere Associates, L.L.C. ("Associates") and Cecere Realty Associates, LLC ("Realty" and, with Associates, the "Debtors"), Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 for an Order (I) Establishing and Approving Bidding Procedures with Respect to the Sale of Real Property of the Debtors and (II) Approving a Sale Free and Clear of Liens, Claims, Encumbrances and Interests (the "Motion"), respectfully states and alleges:

1197008.1

**PRELIMINARY STATEMENT**

1. Debtors' proposed Section 363 sale is ill-conceived, detrimental to the estates and their creditors, wasteful of judicial and litigants' resources, and fundamentally misleading. Most troublesome is Debtors' representation that the proposed Section 363 sale of real estate, on which a once-operable gas station has now sat dormant for two years, "has no conditions precedent." Motion, ¶ 32. That representation is inaccurate.

2. First, the Stalking Horse[1] buyer is not required to take possession of the property, nor go through with the sale, unless and until Debtors confirm a plan of reorganization. That is a monumental condition precedent. This Court can take judicial notice that, generally, the odds of confirming a plan in Chapter 11 are miniscule, and those slim odds are greatly reduced where, as here, there is no operating business, there is no cash flow to adequately protect three secured creditors, and, demonstrably, there is no equity for shareholders. There is no good reason why this case was not filed as a Chapter 7 liquidation.

3. Second, it is fundamentally misleading to suggest the proposed sale has no financing contingency. Because the Stalking Horse buyer clearly is unable to procure traditional, or even subprime, non traditional, financing, Debtors are the lender for this skewed deal. Debtors have zero expertise as lenders, their expertise being only in operating a failed gas station. They intend to make a sweetheart loan with an incredibly low and indefensible 6.5% interest rate to a sub, sub prime borrower in a market in which no legitimate lender has agreed to make this loan. The loan requires the Court to approve a Chapter 11 debtor, with one heavily encumbered asset, no cash flow, and a hotly contested bankruptcy, financing $ 700,000 over

---

[1] Capitalized terms, unless otherwise clear from the context, shall have the meaning ascribed to them in the Motion.

1197008.1                                    2

eight years secured solely by PFI's already encumbered collateral and worthless personal guarantees. This fundamentally is <u>not</u> the Debtors' decision to make, a decision which imposes on its secured creditors a risky and unacceptable payout over eight years.

4. Third, payment of most of the consideration under the proposed sale is wholly contingent, dependent solely upon this Court accurately assessing the likelihood of success for the buyer – not the Debtors – operating a start up business for the next eight years in an unprecedented economic market, the likes of which have not been seen since the Great Depression. Where does the Court even begin to make that factual assessment of a non-debtor entity? What benefit does the estate get from this massive undertaking? Who pays the cost of that litigated evidentiary hearing?

5. Fourth, all payments under the proposed sale are contingent upon the Debtors' estates escaping unscathed from administrative insolvency from the inherently risky operation of a gas station over the next eight years. The Debtors will not be the ones operating the gas station, but they will remain squarely on the liability hook as the owners of this property. Under the structure of an Installment Sales Contract, in which Debtors continue to hold title for the next eight years and the buyer can default at any time without meaningful consequence, Debtors' estates are liable for any and all third-party liability - - whether a result of personal injury, environmental contamination, or catastrophe - - from buyer's operation of a gas station on the property. Damages from any of those reasonably likely events either would be administrative expenses or non-dischargeable, post-bankruptcy claims; in either case, the potential liability likely would easily render the estate insolvent and jeopardize any recovery for creditors. And this risk is for an estate in which it is extremely unlikely unsecured creditors

will receive any distribution, and equity shareholders have no stake whatsoever in the proposed sale.

6.  Fifth, the proposed structure of the sale - - for no apparent or expressed business reason - - requires the Court and interested parties to incur the cost of litigating both a contested Section 363 sale and a contested confirmation process.  During the time period leading up to confirmation, Debtors are incurring tax obligations, utilities, interest on secured debt, legal fees (for their own counsel as well as for PFI and two other secured creditors), and Chapter 11 Trustee's fees. There are no other assets or cash flow with which to pay those on-going administrative expenses.  These Debtors already, arguably, are administratively insolvent, their solvency ultimately depending upon how the buyer - - not the Debtors - - operates a gas station over the next eight years.

7.  Accordingly, for title to pass to the proposed buyer, many arguably insurmountable contingencies need to be met: Debtors must confirm a contested plan of reorganization; the Court must bless the Debtors' financing of $ 700,000 over eight years to a buyer which cannot get this loan anywhere else, a loan secured only by already encumbered property; the buyer must actually meet its financial obligations to the estates and all other creditors for the next eight years; and the buyer essentially must evade all significant operating liabilities and be profitable - - or clearly the interest payments, and $200,000.00 balloon payment in year eight, never will be made. During this time, administrative expenses will accrue unpaid, catastrophic administrative insolvency looms large because the Debtors remain liable for eight years while the buyer operates a risky gas station business, and Debtors somehow will have to fund litigation with PFI concerning the extent of its lien. If PFI succeeds

in that litigation, as it fully expects to do, only the first and second liens will share in the sale of this property.[2]  For any one of these good and sufficient reasons, the Motion should be denied.

## BACKGROUND

**A.      The Loan Documents.**

8.      On July 26, 2004, Associates, Realty, Michael A. Cecere, and his wife, Marina L. Cecere, being indebted to PFI, a corporation of New Jersey, in the sum exceeding $120,000.00, executed to PFI a Promissory Note, Motor Fuel Contract, Recapture Agreement, Lease Agreement, Security Agreement and related documents (the "Loan Documents") to secure that sum, with interest at the rate of 18% per annum, together with all other indebtedness arising under the Loan Documents (the "Debt").

9.      To secure payment of the Debt under the Loan Documents, Realty executed to PFI an Open Ended Mortgage (the "Mortgage") of same date with the Note and Loan Documents and thereby conveyed to PFI in fee the land described in the Mortgage, on the condition that such conveyance should be void if payment should be made according to the terms of the Note and Mortgage.  The Mortgage was recorded in the Office of Morris County Clerk, on July 26, 2004, in Book 17777 of Mortgages for said County on pages 131 et seq.  The Mortgage is not a purchase money mortgage.

10.     To secure payment of the Debt under the Loan Documents, Michael A. Cecere, joined by his wife, Marina L. Cecere, executed to PFI a Personal Guaranty of same date,

---

[2] Debtors have filed a "Complaint (I) For Damages Arising From Breach of Contract and Tort, (II) for Rescission or Reformation of Contract, (III) to Determine the Extent, Validity and Priority of Liens and (IV) for Other Related Relief (the "Complaint").  PFI submits most, if not all, of the relief sought in the Complaint is frivolous, having already been litigated and decided in PFI's pending State Action (defined infra).  In a separate motion, PFI will move for this Court to abstain from deciding any residual relief sought by the Complaint and not already decided in the State Action.

personally guarantying payment of the Note, Mortgage and Debt due under the Loan Documents.

### B.    Future Advances Secured By The Open Ended Mortgage.

11.    Both the Note and Mortgage contained an agreement that, if default was declared, the full amount of all unpaid principal, interest, advances by the mortgagee, costs of collection, attorneys' fees, together with all other unpaid interest and other amounts due on the Loan Documents and Open Ended Mortgage, should become immediately due.

12.    Specifically, the Recapture Agreement, one of the Loan Documents referenced above, provides for Future Additional Advances. This provision at Paragraph 1(b) states:

> [n]otwithstanding the foregoing, upon written request of the Purchaser, the Lender at its sole and absolute discretion, may advance a sum or sums in excess of the amount set forth in paragraph 1 (a) (the "Future Additional Advances") and such Future Additional Advances shall be advanced under the same terms and conditions including the payback provision through increased gallonage requirements, as set forth in this document. <u>A revision of the Open Ended Mortgages executed simultaneously with this Recapture Agreement will be unnecessary as any Future Additional Advances loaned to the RETAILER will automatically attach to the Open Ended Mortgages and increase same</u>. (Emphasis supplied).

13.    Debtors misrepresent in the Motion, Paragraphs 17, 18, and 19, that the Mortgage secures repayment only of the $ 120,000 Note. To the contrary, the Mortgage in the definition section, Paragraphs F & K, defined the following terms:

> **"The Debt"** means all sums due and owning (sic) under the Motor Fuel Supply Contract dated July 26, **2004,** including any and all PFI Accounts Receivable (as defined in the Motor Fuel Supply Contract), the Recapture Agreement, the Promissory Note, the Security Agreement (the "Security Agreement") and the Loan Agreement as defined above including any Future Additional Advances made pursuant to the Loan Agreement which are merged into this Open Ended Mortgage and shall be secured by same.

>  **"Merger of Debt"**, shall mean that the sums due and owing under this Open Ended Mortgage shall include the sums paid under the Loan Agreement along with those sums that remain outstanding on the Motor Fuel Supply Contract and any and all sums due and owing under Future Additional Advances, which sums shall collectively be named ("The Debt"). For all purposes herein the Motor Fuel Supply Contract, and/or Recapture Agreement and/or Promissory Note, and /or Loan Agreement and/or Security Agreement and/or this Open Ended Mortgage and/or Guaranty, and/or Loan Documents (as defined below) shall be cross mortgaged and/or cross secured so that a default on one is a default on all and all the sums due and owing under these documents will be accelerated.

### C. **Lost Profits Are Secured By The Open Ended Mortgage.**

14. Debtors also contend, as a matter of law, that PFI cannot recover lost profits as a "lost volume seller" under New Jersey's Uniform Commercial Code. <u>See</u>, Motion, ¶ 62. PFI is confident Debtors are legally estopped from even making that factually intensive argument, since the Motor Fuel Supply Contract-Terms and Condition - at Paragraph 12(e)(ii) - provides for lost profits, overhead expenses, incidental and consequential damages, and damages from unsold gallons of product. This provision states:

> SELLER may, at SELLER's option also recover damages for lost profits, inclusive of overhead expenses, which SELLER would have obtained except for the failure of the RETAILER to perform the obligations under the Motor Fuel Supply Contract and/or this Recapture Agreement. In addition to the foregoing, incidental and consequential damages are to be included, including costs and attorneys fees. **It is specifically understood by and between the parties that the SELLER shall not be obligated to mitigate damages as SELLER is deemed a "Lost Volume Seller", wherein SELLER is deemed to have unlimited purchase sources for third parties over and above the sale to the RETAILER herein; therefore, the failure of RETAILER under this Recapture Agreement to accept the goods shall not cause SELLER to seek out alternate sales.**

1197008.1

7

**D.     Debtors Are Liable For Attorneys' Fees And Interest.**

15.     While the parties litigate – in NJ Superior Court – these issues, Debtors' estates will be liable for accruing interest, attorneys' fees for their own counsel, and legal fees for PFI's counsel. The Recapture Agreement, at Paragraphs 7 & 8, contains the following default provision:

> That RETAILER further agrees, that in the event the said Promissory Note (Exhibit "B") is placed in the hands of an attorney for collection, to pay twenty-five percent (25%) attorneys fees on the said principal, legal rate of interest of eighteen percent (18%) per annum or the maximum legal rate, whichever is lower, accruing from the date of said default on the unpaid balance, and all costs associated therewith. Also, RETAILER agrees that, in the event any installment under said Promissory Note is not paid, credited and/or recaptured when due, as provided for under the terms and conditions herein, all remaining installments and unpaid cash balance shall automatically and at once become due and payable without demand or notice; and it is acknowledged by RETAILER that said Promissory Note has been delivered to SELLER, who acknowledges receipt thereof.

The Motion proffers no adequate protection for any of these secured interests.

**E.     PFI's Contractual Right Of First Refusal.**

16.     The proposed Section 363 sale ignores PFI's contractual right of first refusal, as if treating that valuable right as not existing excuses Debtors' obligation to reconcile a valuable contractual right with the proposed auction process. The Motor Fuel Supply Contract provides in pertinent part:

> **19.     OPTION/RIGHT OF FIRST REFUSAL.** In addition to the obligations contained in any and all agreements between Seller and Buyer, the Seller shall have the Right of First Refusal to match any bona fide offer accepted by Buyer to purchase, lease and/or other transfer or convey the Buyer's interest in the Service Station and/or the ownership interests in the Limited Liability Company currently known as Route 202 Boonton Shell (formerly Triangle Exxon).

> Additionally, the Seller shall have the Right of First Refusal to match any bona fide offer accepted by Buyer to purchase, leased and/or other transfer or convey the Service Station Land Owner's interest in the real property on which the Service Station is located and/or the membership interests in the company known as Cecere Realty Associates, LLC. The Service Station Land Owner has given its consent as evidenced by its execution of this document.

**F.  The Pending State Action Is The Only Appropriate Forum With Jurisdiction To Litigate Debtors' Pre-Petition Breach of Contract Claims.**

17. On or about December 27, 2007, PFI filed in the Superior Court of New Jersey, Chancery Division (the "State Action"), a Foreclosure Complaint against Associates, Realty and Michael and Marina Cecere (collectively, the "Defendants"). A copy of the Complaint is annexed as Exhibit "A" to the Certification of Michael Gaus, Esq., in Support of P.F.I., Inc./Northwest Petroleum's Objection to Debtors' Motion Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 for an Order (I) Establishing and Approving Bidding Procedures with Respect to the Sale of Real Property of the Debtors and (II) Approving a Sale Free and Clear of Liens, Claims, Encumbrances and Interests (the "Gaus Cert."), submitted herewith.

18. On or about April 2, 2008, the Defendants filed an Answer to Complaint in Foreclosure. The answer expressly raises all of Debtors' breach of contract claims. A copy of the Answer is annexed as Exhibit "B" to the Gaus Cert.

19. On or about March 10, 2009, Chancery Court Judge Catherine M. Langlois entered an Order Dismissing Answer As Uncontested, which validated the PFI lien status and allowed for the scheduling of a hearing and additional discovery to litigate Defendants' breach of contract claims, if Defendants contested PFI's application for Final Judgment. A copy of the Order is annexed as Exhibit "C" to the Gaus Cert. That hearing was never scheduled because

1197008.1                                9

(i) PFI and Debtors commenced negotiations for PFI to purchase the Property; and (ii) Associates and Realty filed for bankruptcy.

20.  In the event the Court grants PFI, in a separately filed motion, relief from the automatic stay, PFI is prepared to submit its pleadings in support of entry of Final Judgment within ten days of the entry of relief in this case.

21.  Debtors concede in their Motion that a determination of whether PFI is a Lost Volume Seller, under the UCC, is a matter of law.  See, Motion ¶ 62.  Thus, no discovery is needed to address that breach of contract issue, and a hearing in the State Action concerning the extent of PFI's lien may be promptly and efficiently conducted.

## SPECIFIC OBJECTIONS TO MOTION

### A.    Section 363 Is Inapplicable, Without An Articulated Business Reason, To Warrant The Sale Of Debtors' Only Asset.

22.  In the Third Circuit, to approve a Section 363 sale the Court must find that there is a " 'sound business purpose' why the sale should be allowed to take place outside of the ordinary course of Subchapter II of Chapter 11." See In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).

23.  The debtor has the burden to establish the sound business reasons for the proposed Section 363 sale.  See In re Congoleum Corp., No. 03-51524, 2007 WL 1428477, at *2 (Bankr. D.N.J. May 11, 2007).

24.   The Court may consider other factors when deciding whether to permit the sale,[3] but it is always to bear in mind that a Section 363 sale is the exception, rather than the

---

[3] See, e.g., In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) ("In fashioning its findings, a bankruptcy judge . . . might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and

rule, for disposing of a debtor's assets within the construct of a Chapter 11 proceeding. See In re WDH Howell, LLC, 298 B.R. 527, 534 (D.N.J. 2003).

25. Where the Debtor fails to establish a "sound business purpose" or other compelling circumstances for the sale, courts will not hesitate to deny a Section 363 sale. See, e.g., In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that creditor's committee's insistence on Section 363 sale was not a sufficient business reason to warrant approval of the sale); In re Encore Healthcare Assocs., 312 B.R. 52, 57 (Bankr. E.D. Pa. 2003) (denying Section 363 sale because there was no business justification for such sale); In re Sovereign Estates, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989) (same).

26. Here, Debtors provide no "sound business purpose" or compelling reason why they must dispose of this property through a Section 363 sale rather than await a plan confirmation proceeding. Debtors' assertion at paragraph 51 of their motion papers, that "[t]he decision to sell is based upon sound business judgment" because they no longer need the property for their business, states the obvious, but utterly fails to provide the well articulated "business purpose" that must exist to permit a 363 sale. There is no allegation that the Property is deteriorating or the value diminishing.

### B.    Debtors Fail To Propose Let Alone Provide Adequate Protection.

27. Conspicuously absent from the Motion is Debtors' proffer of adequate protection to any of the four lien holders (three mortgages and one tax lien) pending (i) approval of the sale; (ii) confirmation of a plan; or (iii) operation of a risky business over the next eight years. Each of these contingent events may take months or even years to occur.

---

confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value."

1197008.1                                11

28. The concept of adequate protection is not just essential to Section 363, it is mandatory to comply with the requirements of the Fifth Amendment. <u>See</u>, <u>Louisville Bank v. Radford</u>, 295 U.S. 555, 589 (1935) (the Bankruptcy power, like the other great substantive powers of Congress is subject to the Fifth Amendment). As this Court has noted, "the Congressional purpose of this section [Section 361] is to ensure that the secured creditor receives in value essentially what he bargained for." <u>Explexx Software Corp. v. AGI Software, Inc.</u>, 199, B.R. 850, 861 (Bankr. D.N.J. 1995), quoting in part, <u>In re Ram Manufacturing, Inc.</u>, 32 B.R. 969, 971 (Bankr. E.D.Pa. 1983).

29. Despite the pending motion for a Section 363 sale, the Debtors have not provided adequate protection to the secured lienholders as they are required to do under Section 363(e). It is the Debtors' burden to prove that adequate protection exists or offer sufficient protection in any manner available. <u>See</u> <u>In re Grant Broadcasting of Phila., Inc.</u>, 711 B.R. 376, 386 (Bankr. E.D. Pa. 1987); <u>see also</u> <u>In re Swedeland Dev. Group, Inc.</u>, 16 F.3d 552, 564 (3d Cir. 1994). Debtor has neither offered nor provided any form of adequate protection.

30. In such a circumstance, where adequate protection is not even provided, relief from the automatic stay should be granted pursuant to Section 362(d) for cause. <u>See</u> <u>In re Phila. Consumer Discount Co.</u>, 32 B.R. 322, 325 (Bankr. E.D. Pa. 1983); <u>In re Gambler</u>, 21 B.R. 3, 4 (Bankr. E.D. Pa. 1982). Thus, PFI has separately filed a cross motion for relief from the stay which, if granted, precludes a § 363 sale of the Property.

**C. Section 363 Relief Should Be Denied, When The Sale Is Contingent Upon Confirmation Of A Plan, As Needlessly Duplicative Of Legal Expenses And Wasteful Of Judicial Resources.**

31. When deciding whether to permit a Section 363 sale, a bankruptcy court may consider whether a plan of reorganization will be proposed or confirmed in the near future. <u>See</u>

Lionel, 722 F.2d at 1071; Encore Healthcare Assocs., 312 B.R. at 57 (noting that "[t]he pre-confirmation sale of assets in Chapter 11 is often an important step in furtherance of a reorganization proceeding," but holding that "such is not the case here" where there was no business justification for the sale because the Debtor was not operating a business on the property).

32. In the instant case, the Section 363 sale between the Debtor and the Stalking Horse is fraught with contingencies, not the least of which is that going through with the sale and taking possession of the Property is contingent upon the confirmation of a plan of reorganization. Here, the sale requires a confirmation proceeding.

33. Thus, where a Section 363 sale might be permitted to the extent it would resolve the disposition of certain assets in advance of confirmation of a plan of reorganization, it makes absolutely no sense for this Court to countenance a contested Section 363 sale proceeding and a contested plan proceeding when the Section 363 sale will in no way simplify the issues to be resolved or temporarily preserve the value of the asset.

34. This will be a waste of time, money, and judicial resources for all involved because the Court will be forced to deal with the same issues in the sale process that might be avoided during the confirmation stages of these proceedings. Stated differently, a sale logically can be part of the confirmation process but no business purpose is served by the sale preceding that plan process. This proposed sale is a colossal waste of resources.

**D. The Proposed Section 363 Sale Is Contingent, Illusory and Detrimental To The Estate And, Therefore, Approval Should Be Denied.**

35. As noted above, in addition to the need for a business purpose for approval of a Section 363 sale, the bankruptcy court must also find that the proposed sale is for a fair and

1197008.1                                    13

reasonable price and that the parties to the sale are acting in good faith and without any sort of fraud or collusion. Debtors' proposed Section 363 sale fails on both of these counts.

36. First, under the terms of the Installment Sale Contract, the Stalking Horse purchaser is only required to make an initial deposit of $400,00.00 with an additional $34,000,00 to be paid upon approval of the plan of reorganization. The balance of the purchase price, an additional $700,000.00 plus interest over the next eight years, is purely speculative and highly risky.

37. There is no guarantee to PFI or any of the other creditors that the amounts to be paid over the next eight years, totaling $700,000, will ever be paid. The first and second mortgages (the amounts not genuinely in dispute) alone exceed the initial $400,000 payment. For that reason alone, the sale should be denied.

38. Pursuant to Section 363 (f)(3), the purchase amount of a Section 363 sale must be greater than the value of the liens. In addition, "the bankruptcy court should not order property sold free and clear of liens <u>unless the court is satisfied</u> that the sale proceeds will fully compensate secured lienholders and produce some equity for the benefit of the bankrupt's estate." <u>WDH Howell</u>, 298 B.R. 527, 534 (D.N.J. 2003) (quoting <u>Matter of Riverside Inv. P'ship</u>, 674 F.2d 634, 638-41 (7th Cir. 1982)) (emphasis added); <u>Cf.</u> <u>Delaware & Hudson Ry. Co. v. Guildford Transp., Indus.</u>, 124 B.R. 169, 177 (D. Del. 1991) (upholding Section 363 sale but noting that bankruptcy court found that purchase price of $25 million was not subject to any financing contingencies and was backed by $19 billion in net assets): <u>In re Work Recovery Inc.</u>, 202 B.R. 301, 304 (Bankr. D. Ariz. 1996) (approving Section 363 sale, but noting that sale "has no other conditions which will impact on the reorganization plan. In other words, the sale has no 'strings' or 'catches.'")

39. Here, as shown in Exhibit D to the Certification of Michael C. Gaus, Esq., Debtors admit there is no equity in the Property. There is negative equity of over $200,000.00. Even with the contingent, risky payments over eight years, there still is no money available for equity. Worse, if no operating liabilities are incurred over the next eight years, there is still a good chance the creditors will not receive payment for their liens if the Stalking Horse fails to run a successful business.

40. In addition, Debtors offer no adequate protection in any form to the first lien holder, PFI, or the third lien holder. Because there is no equity cushion, this sale does not even provide the hope for adequate protection, required under Section 363(e), if the property is sold for an amount in excess of the liens. See In re Grant Broadcasting of Phila., Inc., 711 B.R. 376, 386 (Bankr. E.D. Pa. 1987). It is the Debtors' burden to prove that adequate protection exists and offer sufficient protection in an alternate form, if necessary. See id.; see also In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994). Debtors have neither offered nor provided any adequate protection for the secured lienholders.

41. Moreover, the Court should closely scrutinize the good faith of this transaction. Debtors are funding the Stalking Horse's purchase of the property at an incredibly low interest rate. Debtors will be buyer's lender over the next eight years in exchange for worthless indemnification and personal guarantees of the buyers. No lender has agreed to finance this sweetheart deal.

42. Courts do no approve Section 363 sales where the buyer and debtor are found to be in collusion in arranging a sale to the detriment of the estate. See In re Abbotts Dairies of Pa., 788 F2.d 143, 147 (3d Cir. 1986) ("The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the

misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)); In re The SCO Group, Inc., No. 07-11337, 2009 WL 2425755, at *4 (Bankr. D. Del. August 5, 2009) (denying Section 363 sale in absence of "sound business purpose" and questions of good faith raised by "questionable timing" of proposed sale); In re Sovereign Estates, 104 B.R. at 704 (denying Section 363 sale for lack of business purpose, insufficient notice, and failure to prove good faith when sale was part of proposed settlement agreement that granted "various perks to non-debtor insiders.")  Debtors' good faith has to be questioned, given the extraordinarily risky financing arrangement.

### E. Debtors' Proposed Sale Fails To Account For PFI's Right Of First Refusal And, Accordingly, Must Be Denied.

43. The right of first refusal appears as part of The Motor Fuel Supply Contract (the "Contract") between the Debtors and PFI.  As an executory contract, the Debtors' have two options to deal with the right of first refusal provision in the Contract.  See In re Kellstrom Indus., Inc., 286 B.R. 833, 834-835 (Bankr. D. Del. 2002) (right of first refusal is executory contract).

44. First, Debtors may assume the Contract and all provisions contained therein, which includes the right of first refusal.  See, In re The IT Group, Inc., 302 B.R. 483, 488 (D. Del. 2003) (right of first refusal may be enforced in bankruptcy context); see also In re E-Z Serve Convenience Stores, 289 B.R. 45, 49 (Bankr. M.D.N.C. 2003) (holding that where lease is assumed, right of first refusal is also assumed and stating that "[w]hen an executory contract or lease is assumed, it must be assumed *cum onere*, with all of its benefits and burdens.").

45. Second, Debtors may reject the Contract and compensate PFI for all damages associated with such rejection which is the equivalent of a breach of the contract. See 11 U.S.C. § 365(g); see also In re Fleishman, 138 B.R. 641, 647-648 (Bankr. D. Mass. 1992) (noting that a holder of a right of first refusal in a rejected executory contract would be entitled to a lien for the consideration paid for the right of first refusal and would be entitled to compensatory, consequential, and incidental damages as a result of the breach of such right).

46. Debtors have neither assumed nor rejected the Contract, nor offered any compensation to PFI for the loss of its right of first refusal. As a bargained for provision of the Contract which retains value for PFI, at the very least PFI should be entitled to assert a claim against Debtors for the value of the right of first refusal and damages as a result of the loss of this right. See, IT Group, 302 B.R. at 488 (noting that a right of first refusal is a cognizable property right); E-Z Serve Convenience Stores, 289 B.R. at 51 (holding that a "right of first refusal is a material and bargained for element of the Lease which is economically significant . . . .").

**F.   Debtors Fail To Establish PFI's Interest In The Property Is In <u>Bona Fide Dispute</u>.**

47. The only ground upon which Debtors rely, to approve the Motion over PFI's objection, is § 363(f)(4). Toward the objective of showing a bona fide dispute concerning PFI's lien, Debtors filed the Complaint. As PFI will show in separately filed motions, the State Action already determined with finality the validity and priority of PFI's lien, and those findings can never again be litigated.

48. The "extent" of PFI's lien – a function of Debtors proving a breach of contract -- is not a bona fide dispute under Section 363(f). Thus, it provides no basis to approve the

Motion.  A <u>bona</u> <u>fide</u> dispute is one where the validity, extent, or priority of the lien is in question.  In other words, such a dispute concerns the basis or propriety of the lien, not merely its value.  <u>See</u> <u>In re Wolf</u>, 162 B.R. 98, 106 (Bankr. D.N.J. 1993); <u>see</u> <u>also</u> <u>In re NJ Affordable Homes Corp.</u>, No. 05-60442 (DHS), 2006 WL 2128624, at *10-11 (Bankr. D.N.J. June 29, 2006).   Here, the State Action has already determined the priority and validity of PFI's lien. All that remains in dispute is the "extent" of the lien.  That is strictly a function of whether Debtors are entitled to any set off against the value of those liens based on their highly speculative contract claims.  Those pre-petition, breach of contract claims should be decided in the pending State Action.  Moreover, PFI submits those claims will be dismissed by motion in the pending State Action as a matter of law.

49. Thus, § 364(f)(4) provides no basis for granting the Motion.

## CONCLUSION

For each of the reasons set forth above, the Motion should be denied.

**WOLFF & SAMSON PC**
Attorneys for P.F.I., Inc./Northwest Petroleum


By:     /s/ Robert E. Nies
         Robert E. Nies

Dated: September 8, 2009

1197008.1                                    18